**ROY LEE LUMBER COMPANY et al.,**
Appellants,

v.

Thomas N. GREEN, Appellee.

No. 6054.

Court of Civil Appeals of Texas.

Beaumont.

Jan. 24, 1957.

Marcus, Weller & Evans, Beaumont, for appellants.

Adams & Browne, Beaumont, for appellee.

R. L. MURRAY, Chief Justice.

This is an appeal by Roy Lee Lumber Company et al., appellants, from a judgment against them in the district court of Jefferson County in favor of Thomas N. Green, appellee, in a suit for damages arising out of an automobile-truck collision.

The appellee Green was driving his car south on Fourth Street in the City of Beaumont, accompanied by three fellow workmen. He stopped his car and parked it on Fourth Street between Laurel Avenue and South Street. The car was stopped on the right-hand side of the street near the curb. Green was seated at the wheel and opened the left car door to get out of the car into Fourth Street. At some time during the commission of the act of getting out, or attempting to get out, of his car the truck of the appellants Roy Lee Lumber Company, and driven by the appellant Willis King, came south on Fourth Street across Laurel Avenue and came in contact with Green's car. Green's car was damaged and he, himself, received physical injuries for which he was treated by his physician. The truck was a flat bed truck and was loaded with 20 sacks of cement, each weighing 94 pounds and 4 yards of sand, each yard weighing approximately 2,200 pounds. King was driving the truck in the ordinary course of his employment for Roy Lee Lumber Company, delivering the cement and sand on a mission for the lumber company. At the point where Fourth Street crosses Laurel Avenue, going south, Fourth Street makes a jog to the east, and as a result the curb lines of Fourth Street on the south side of Laurel Avenue are approximately 10½ feet east of the curb lines of Fourth Street on the north side of Laurel Avenue.

The appellee sued the appellants, alleging that above and other matters in detail as to the cause of the accident and alleged that the driver King was negligent (1) in failing to keep a proper lookout; (2) in failing to have his vehicle under proper control; (3) in operating said vehicle too close to Green's vehicle; (4) in operating his vehicle at an excessive rate of speed under the circumstances and (5) in operating said truck in excess of 30 miles per hour in violation of the ordinances of the City of Beaumont. He also alleged that such acts of negligence were a direct and proximate cause of his injuries and damages. He alleged physical injuries to his back, left hip, left leg, neck and cervical spine and left shoulder; that he had incurred the necessary medical expense and that his automobile was damaged and broken. He sued for all of his injuries and damages. The appellants answered by general denial and special denial that King, the driver of the truck, was guilty of any acts of negligence and denied that any act or omission on the part of the driver caused or contributed to cause the injuries or damages to Green, and alleged further that Green was guilty of contributory negligence on his part. They also pleaded an unavoidable accident and further pleaded that any injury or damage sustained by Green was brought about by a new and independent cause. Appellant

King also specially answered that he was driving in his proper lane of traffic, going south on Fourth Street in the City of Beaumont, and the front part of his truck and cab had passed the place where Green's car was parked when Green suddenly and without looking to his rear, opened the left front door of his car, striking the truck about midway the body of the truck; "that said door was opened without the plaintiff in any way looking to his rear or looking to the side of the car" to see whether the car door could be safely opened and that such act constituted a violation of the ordinances of the City of Beaumont; that all said acts of negligence were the proximate cause of the occurrence complained of by the appellee.

The case was tried to a jury and at the conclusion of all the testimony, the appellants filed a motion for instructed verdict which motion was overruled by the court. The case was submitted on special issues and the jury by their verdict found in answer to such special issues that (1) Thomas Green was injured as a result of the occurrence in question; (2) that appellant King failed to keep his truck under proper control; (3) that such failure was a proximate cause of the collision; (4) King failed to maintain a proper lookout; (5) such failure was a proximate cause of Green's injuries and damages; (6) that King operated his truck more closely to Green's car than a person of ordinary prudence in the exercise of ordinary care would have operated it; (7) that such operation was approximate cause of the collision. The jury by Special Issue No. 8 did not find that Green failed to keep a proper lookout before attempting to open the door of his car. In answer to Special Issue No. 10 the jury did not find that Green was negligent in opening the door and attempting to get out of his car on the left-hand side. In answer to Special Issue No. 12 the jury did not find that the door of appellee's car was opened by Green into the truck. In answer to Special Issue No. 15 the jury found that the accident in question was not the result

of an unlawful accident. They further found that medical services furnished Green were reasonably necessary and to No. 17 that a reasonable charge therefor was $300; to No. 18 the jury found that $165 was a reasonable amount for the repairs made necessary to Green's car as a result of the collision. In answer to Special Issue No. 19 the jury found that $9,000 is a sum of money that would fairly and reasonably compensate Green for the injuries proximately caused by the negligence of the appellants, including loss of earnings and physical pain and suffering.

In the charge itself the trial court defined the terms "proper lookout" and "proper control".

After the verdict of the jury was received the appellants filed a motion for judgment notwithstanding the verdict, which motion was overruled. The court entered judgment in favor of the appellee against the appellants for the sum of $9,465.

The appellants filed their motion for new trial and their amended motion for new trial, which amended motion was overruled by the court and the appellants have duly perfected their appeal. Appellants bring their appeal under 86 points of error.

Appellants contend that the trial court erred in (Point 1) overruling their motion for instructed verdict, (Point 2) overruling their motion for judgment non obstante veredicto, (Point 3) refusing to grant their motion for judgment non obstante veredicto, contending that the undisputed evidence established that appellee Green opened the door of his car into the truck with the door of the car striking the right-hand side of the bed of the defendants' truck at a point approximately one-third of the distance behind the front end of the bed of the truck and that such act of Green in opening his car door into the truck was negligence and a proximate cause of the occurrence; (Point 4) in failing to disregard the answer of the jury to Special Issue No. 2 for the reason that there was no evi-

dence that the appellant King failed to keep his truck under proper control.

■ The appellants have grouped the above points for discussion and argument in their brief. We shall also consider them together, as did the appellee in his reply brief. We shall also consider with the above four points appellants Points Nos. 5 through 29, inclusive, because in our opinion all of the first 29 points of appellants' brief are concerned with the sufficiency of the evidence to support the jury's findings that appellant King failed to have his truck under proper control and failed to maintain a proper lookout, and that such failures and omissions were a proximate cause of the appellee's injuries and damages. Appellants have carefully and zealously presented their main contention that the evidence did not show any negligence on the part of the truck driver King or that any acts or omissions of King were a proximate cause of this accident and they raise it in several different forms of attack. In the course of these various contentions under Points 5 to 29, inclusive, they assert, too, that the evidence shows as a matter of law that Green's act in opening his car door into the truck was negligence and a proximate cause of the accident. For instance, as to the question of whether King failed to have his truck under proper control, they say by various points: the trial court erred in failing to disregard the jury's finding that King failed to keep his truck under proper control, that the court erred in overruling their objection to Special Issue No. 2, which objection was that there was no evidence to warrant the submission of the issue, nor to show any improper driving which caused or contributed to cause the accident, that the court erred in overruling their objection to said Special Issue No. 2, which objection was that the undisputed evidence showed that the accident happened when Green opened the door of his car into the body of appellants' truck which was then passing the parked car; they say the court erred in failing to disregard the answer to Special Issue No. 2, because the finding was so against the great weight and preponderance of the evidence as to be clearly wrong and should be set aside; that the court erred in overruling their objection to the submission of said Special Issue No. 2, which objection was that any affirmative finding that King failed to maintain proper control will be so against the great weight and preponderance of the evidence as to be clearly wrong; that the court erred likewise in failing to disregard the answer of the jury to Special Issue No. 3, (that the failure of King to keep his truck under proper control was a proximate cause) contending that there is no evidence that such failure was the proximate cause; that the court erred in overruling their objection to the submission of Special Issue No. 3 in the charge, such objection being that there was no evidence to show any improper driving by King or that any act or omission by him was the proximate cause; they say the court erred in failing to disregard the answer of the jury to Special Issue No. 3, because the failure, if any, of King to keep his truck under proper control was not a proximate cause as a matter of law, for the reason that the proximate cause was Green's act in opening the door of his car into the truck; they also say the court erred in overruling their objection to the submission of said Special Issue No. 3, which objection was that the undisputed evidence showed that Green and all the witnesses for him did not observe the appellants' truck until after contact or collision and the contact between the door of the car and truck occurred immediately at the time the door was opened, and defendant's failure to maintain proper control could not have been a proximate cause as a matter of law; they likewise contend that the court erred in failing to disregard the answer of the jury to said Special Issue No. 3, because such finding is so against the great weight and preponderance of the evidence as to be clearly wrong; they say the court erred in overruling their objection to the submission of Special Issue No. 3, such objection being that any finding of the jury that the failure

of King to maintain proper control was a proximate cause would be against the great weight and preponderance of the evidence and clearly wrong; they likewise contend that the court erred in failing to disregard the jury's answer to said Special Issue No. 3, because there was no competent evidence to discharge the burden of proof on appellee to show by a preponderance of the evidence that the failure of King to keep his truck under proper control was a proximate cause, and they say the evidence is insufficient to discharge such burden of proof; they also say that the court erred in overruling their objection to the submission of said Special Issue No. 3, which objection was that the burden of proof is on the appellee and the evidence is wholly insufficient to discharge such burden and to show failure to maintain proper control by King. The appellants then, beginning with Point 17, make similar and varied attacks as to the evidence in regard to Special Issue No. 4, which dealt with the finding that King failed to keep a proper lookout, and Special Issue No. 5, that such failure was a proximate cause. They also assert errors on the part of the trial court because of its failure to disregard the answers of jury to, and in overruling their objection to the submission of, Special Issues Nos. 4 and 5. Such points are similar in substance to the points dealing with Special Issues Nos. 2 and 3, as detailed above.

It, therefore, becomes necessary to set out a great deal of the testimony. Both the appellants and the appellee have quoted in their briefs a great deal of testimony, all of which we have read and considered. We have also read the entire statement of facts.

Joe Azar, who was riding on the front seat of Green's car with Green at the time of the accident testified as follows:

"Q. After Tom drove up and stopped the car, what did he then do? A. Well, he aimed to get out of his car, he looked back, I was sitting in the front seat with him, and I looked back too, to see anything coming, so he opened the door and at that time I heard a hit, that truck came by.

"Q. What happened to the door? A. The door was all brushed in.

"Q. Tell us what happened to the door when it hit it. A. Well, the door was all brushed in. Glass flew up in my face, and Tom fell back in the car. I say—

"Q. You say Tom fell back in the car? A. Yes, sir.

"Q. Did he have one foot out of the car at the time? A. Yes, sir.

"Q. You say he had looked back and had one foot out of the car and opened the door? A. Yes, sir.

"Q. Put one foot out of the car? At that time the truck hit the door? A. Yes, sir.

"Q. How badly was that door folded up, Joe? A. Well, it was in bad shape.

"Q. Was it folded six inches under, a foot, two feet, or what? A. Well, as I was going to say, I would not know how wide it was, it was all crushed in, yes, sir.

"Q. It was all crushed in? You say Tom was knocked back in the car? A. Yes, sir.

"Q. Then what did Tom do? A. Well, we stood there, and he says, 'Looks like the driver is not going to stop' so he drove back and crossed the next block and stopped, then he got out of his truck, and looked around his truck, and got back in his truck and went on.

"Q. Then what did Tom do? A. Tom and Skipper got in Skipper's car, and went on behind him.

"Q. Skipper was the man that owns that garage—A. Yes, sir.

"Q. —across the street? A. Yes, sir.

"Q. You say Tom and Skipper got in Skipper's car and took out after the truck? A. Yes, sir.

"Q. Before Tom got into Skipper's car, did he say anything when he was knocked back into the car? A. Yes, sir. He said he was hurt. * * *

"Q. About how close to the curb was Tom's car parked? A. Oh, I imagine about four or five inches."

On cross examination Azar testified in part, as follows:

"Q. All right, Now, when you drove up there and stopped on Fourth Street across from Skipper's garage, what did you do? A. What did I do?

"A. Yes. A. I was sitting in the car.

"Q. You were sitting in the car? A. Yes, sir.

"Q. On the front seat? A. Yes, sir.

"Q. On the right? A. Right, sir.

"Q. Was anybody else in the front seat? A. No, sir, just me and Tom Green.

"Q. Who was in the back seat? A. Nolan Barnard and Leslie Apple.

"Q. What side was Leslie Apple sitting on? A. I will tell you, I don't remember. I know they were both in the back seat.

"Q. You don't know what side Joe Barnard was sitting on or on what side Leslie Apple was sitting on? A. No, sir, I don't.

"Q. All right. Now, as you drove up there, what did Thomas Green do? A. Thomas Green looked back.

"Q. Did you see him look back? A. Yes, sir. I looked back myself.

"Q. How did he look back? A. Turned and looked, opened his door.

"Q. Did you notice he looked in his rear view mirror? A. I would not know whether he looked at the rear view mirror or not. He turned his head and looked.

"Q. Was the door opened when he turned his head and looked? A. He was opening the door.

"Q. Oh, he was opening the door as he turned his head? A. That is right.

"Q. This crash happened the very minute he opened the door, didn't it? A. Well, a few seconds after the door was opened, I reckon.

"Q. The very minute he opened the door the crash happened, didn't it? A. Well, I wouldn't say that, because he did not open the door and jump out, he was opening the door and coming out.

"Q. All right. Now, before he started to open that door, did you see him look back? A. Yes, sir.

"Q. Before the door was ever opened? A. At the time he was opening the door.

"Q. All right. Now, before he ever opened the door? Did you see him look back? A. Well, he looked back at the time he was opening the door. I would not say he was looking before the door opened.

"Q. Do you understand my question? A. Yes, sir.

"Q. All right. Answer it. Now, did you see Tom Green look back before he started to open that door? A. Well, I wouldn't say that. I seen him look back and open the door.

"Q. You saw him look back and open the door at the same time, didn't you? And he did not look back until he had the door open, did he? A. I wouldn't know about that, I say he opened the door and—

"Q. And was looking back at the same time, is that right? A. Yes, sir.

"Q. All right. Did you look back? A. I looked back when he looked back, and a few seconds later,—Bang !—

"Q. You looked back at the very minute when he opened the door, is that right? A. I looked back when he looked back.

"Q. You looked back when he looked back? All right. That is clear enough. Now, did you ever see this truck? A. No, sir.

"Q. Could you see all of the way back up to Fourth to Laurel Street, from where your car was parked, back behind the car? A. Yes, sir.

"Q. And when you looked you didn't see this truck did you? A. No, sir.

"Q. You didn't see this truck until after the (counsel slaps hands) after the impact, did you? A. No, sir.

"Q. That was after the impact, the truck had gone on down the street, was the first time you saw the truck, wasn't it? A. That is right.

"Q. Now, if that truck had been behind your car at the time you looked, there was not anything to keep you from seeing it, was there? A. I don't think so.

"Q. You could see all the way down to Fourth Street, couldn't you? A. Fourth Street?

"Q. I mean to Laurel Street? A. Yes, sir.

"Q. You could see all of the way to that traffic light, couldn't you? A. That is right.

"Q. Now, do you know how far it is from where you had your car parked to where that traffic light is? A. No, sir. I would figure maybe over a hundred feet. but I don't know how far.

"Q. You don't know how far? If that truck had been down there at Fourth Street, you would have seen it, wouldn't you? A. Well, if it would have been there I would have seen it, I imagine.

"Q. Yeah. If it had been there you would have seen it? If it was right opposite you, you did not have a chance to see it until after you opened the door, did you? A. It wasn't opposite me.

"Q. Now, if that truck was down there at Fourth Street when—it was behind the car, would Green have had any trouble seeing it? A. If it had been where, sir?

"Q. If the truck had been back behind the car at Fourth and Laurel Street, would Green have been able to see the truck? A. I imagine so, nothing to block it.

"Q. Would you have been able to see it? A. I think so if it had been there.

"Q. You think so? A. Yes.

"Q. Now, Azar, you don't know whether the door of the car came in contact with the truck or whether the truck came in contact with the door, do you? A. I sure don't.

"Q. You can't tell the jury here today whether the door was opened into the truck or whether the truck struck the door? A. I sure can't.

"Q. All right. Now, you don't know what part of the truck this door came in contact with, do you? A. No, I don't.

"Q. To this very day? A. I sure don't.

"Q. You don't know whether it hit the body of the truck or whether it hit the front end of the truck, do you? A. I sure don't.

"Q. Now, did you see this truck stop? A. Yes, sir.

"Q. And after the truck stopped what did the driver do? A. He got out of the truck, looked all around his truck and got back in the truck and went on.

"Q. All right. But he did stop, didn't he? A. Yes, sir.

"Q. Now, Joe wasn't knocked down, was he, (or Tom)? You call him Joe Green also call him Tom Green? A. Yes, sir. We always call him mostly Joe Green.

"Q. Mostly Joe Green? A. Yes, sir.

"Q. He was not knocked down, was he? A. Well, he fell back in his seat.

"Q. You don't know whether the truck came in contact with him or not, do you? A. I sure don't.

"Q. He didn't have any open cuts on him, did he? A. I didn't see any.

"Q. You didn't see any? You didn't see any blood around there, did you? A. No, I didn't.

"Q. Now, this car that you were in, it stayed parked, it didn't move, did it? A. I sure did not feel it move.

"Q. You didn't feel it move, the car wasn't knocked up over the curb, was it? A. No, it wasn't.

"Q. Now, the first time that you saw this truck was after you heard the noise and the truck had passed down in front of the car in which you were sitting, is that right? A. Yes, sir. That is right."

On re-direct examination he further testified:

"Q. Joe, just a minute. Were there any cars coming from south traveling north on Fourth Street? A. I did not see any.

"Q. Did you see any cars at all on Fourth Street except you-all's car and this truck? A. That is the onliest car I seen at that time.

"Q. I mean just before and at the time of the collision? A. Yes, sir.

"Q. Afterwards, I guess a few vehicles came by? A. Yes, sir, some of them passed by.

"Q. How far would you say the truck went down before it stopped? A. It went past the next block, went and stopped.

"Q. Do you know the name of the next street south of Laurel? A. No. I sure don't. * * *

"Q. Now, about what speed was this truck traveling? You said you did not see it until it struck the car. About what speed was the truck traveling when you did see it? A. It was traveling—

"Q. I thought you said you saw the truck immediately after it struck the car, then go on down to the next block, did you? A. Yes, sir.

"Q. Then you had occasion to view that truck as it left the car and went on down the street, didn't you? A. Yes, sir.

"Q. State to the jury about what speed the car—the truck was traveling. A. Well, it was traveling faster than thirty miles an hour, to my estimation."

C. A. Kohler, a surveyor and civil engineer, testified as follows:

"Q. Did you, at my request, go out to the intersection of Laurel and Fourth Street in the City of Beaumont and make some measurements yesterday? A. I did.

"Q. Do you have a sketch with you outlining those measurements and those street intersections? A. I do.

"Q. Can you tell the ladies and gentlemen of the jury how far it is—(Pardon me. Strike that question) Generally speaking, what direction does Laurel Street run? A. East and west.

"Q. And, generally speaking, what direction does Fourth Street run? A. North and south.

"Q. How far is it from the south curb of Laurel, which runs east and west, to the north side of a building on Fourth which building has on the side of it the numbers '270'? A. 134 feet.

"Q. Did you have occasion to look in that little building to see what type of work was going on in there, whether it was garage work, or something else? A. No. I did not.

"Q. How wide is Fourth Street at this little building—yes, Fourth Street, at this little building? A. The street paving is 36 feet wide.

"Q. Now, on the west side of Fourth Street is the west curb of Fourth, south of Laurel, is it a straight line up to Laurel, or does it curve, make an angle? A. Fourth Street jogs at Laurel Street. The distance from the east curb line of Fourth Street south of Laurel to the east curb line of Fourth Street north of Laurel would be 46 feet,—46 and a half feet,—correction.

"Q. Do you have a sketch we might look at, talking about this thing? A. I do.

"Q. We might put this on the wall. (Bailiff produces blackboard) May we erase this? (Referring to sketch on blackboard) (Places drawing on board) Can you ladies and gentlemen of the jury see this all right? Is it clear enough? This sketch you have drawn, does that represent the intersection of Laurel and Fourth? A. It does.

"Q. I will point to the north of it, it is supposed to be north? (Indicating) A. That is right.

"Q. And bottom south? A. Right.

"Q. (Indicating) A. East.

"Q. That is west? (Indicating) A. West.

"Q. This is Laurel Street running east and west, Fourth Street running north and south? A. That is correct.

"Q. Now, I believe you said awhile ago from south curb of Laurel to the north side of this little building with '270 Fourth Street' on it, was how many feet? A. 134 feet.

"Q. 134 feet? How far is it from the south line of Laurel on the west side to the place where it makes a break-away from the straight line of Fourth? A. 70.5 feet.

"Q. That is to this point here? (Indicating) A. That is correct.

"Q. Then, of course, the distance from that point to the south line (I mean north line of this building) would be the difference between 70.5 and 134? A. That is correct.

"Q. Now, do you have the distance from the west curb of Fourth to the east curb of Fourth south of Laurel? A. Along the south line?

"A. Yes. A. Fifty-one feet, three inches.

"Q. I believe you said the width of Fourth here at this building was how much? A. Thirty-six feet.

"Q. Did you measure the width of Fourth Street north of Laurel? A. Yes, thirty feet.

"Q. Now, is that the distance up here before it begins to make this out? A. That is correct.

"Q. Up here it is thirty feet. Now, the distance across, did you measure this at the intersection of Fourth and Laurel? A. That is correct. It is forty-eight feet.

"Q. Now, that appears to give a jog in that Fourth Street, is that correct? A. That is correct.

"Q. Suppose—and did you calculate the projection of the east line of east curb of Fourth Street north of Laurel, project it south if it had been drawn in a straight line, how far west of the west line of Fourth would it come? A. Ten and a half feet. (Counsel takes pencil, draws on drawing on board).

"Q. So, if the east line of Fourth north of Laurel had been projected directly south it would have reached a point ten and a half feet west of the west line? A. That is correct.

"Q. Do you know the name of the street south of Laurel, the next street south? Is that South Street? A. South.

"Q. Is that a regular City block in between Laurel and South? A. I can't remember, it is not unusually different.

"Q. It would be— A. Approximately three hundred feet.

"Q. You did not actually measure it? A. I did not measure it and I do not remember exactly.

"Q. Do you know the distance this little building is from the east curb of Fourth? A. Eighteen feet.

"Q. Was there a telephone post at the intersection of Fourth and Laurel (we call that the southwest intersection)? A. There was a pole there, but it was not a telephone, it was put there to hold the traffic light.

"Q. About what was the diameter of that pole? A. I would say ten inches.

"Q. Now, was there a pole also on the west side of Fourth some distance past the break in the west side of the curb of Fourth?. A. There was. It was a power pole.

"Q. About what was the thickness of it, diameter of it? A. About twelve inches.

"Q. I don't suppose you—Have you measured the width of an ordinary car, can you give. us your estimate? Most of know about how wide they are. Give us your estimate of it. A. I believe six feet, four inches.

"Q. I believe we will say six feet, parked along the west curb of Fourth Street, driver of it sitting behind the wheel would be over a distance of about four feet from the curb, at least four feet, is that correct? A. The driver would be about four feet from the curb, that is correct. (Counsel writes on drawing) '10½ ft.'

"Q. So, that would put the driver fourteen feet from the east curb of Fourth Street sitting in his car here in front of this building, this ten and a half. A. That would be the east curb projected south, that is correct.

"Q. Put him about *forteen* feet east of the east curb of Fourth, wouldn't it? A. That is correct.

"Q. Now, the west curb of Fourth Street, north of Laurel, if projected south, directly, being thirty feet from the east curb of Fourth would then make it 40½ feet from the west curb of Fourth Street from

Laurel on the south side, is that correct? A. That is correct. (Counsel writes on drawing) '40½ ft.'.

"Q. How did you arrive at this place east when you undertook to make these calculations and these measurements? A. I don't understand the question.

"Q. How did you arrive there, walk or ride in a car, or what? A. I drove out there.

"Q. You drove in a car? A. Yes.

"Q. Was that car parked in the vicinity of this little building here? A. That is correct.

"Q. Was it parked approximately directly across the street, something like that? A. That is correct.

"Q. Did you have occasion to get behind the steering wheel of that car and look in the rear view mirror and see what you could see behind you? A. That is correct.

"Q. I will ask you, being behind the steering wheel of that car, looking in the rear view mirror, what do you see behind there? A. Among other things, you could see the approximately the western edge of the filling station, and the eastern side of Fourth Street on the north side of Laurel.

"Q. There is a filling station here? (Indicating) A. Yes.

"Q. Having been marked 'Magnolia Filling Station'? A. Yes, that is correct.

"Q. Sitting in the car, looking in your rear view mirror you would see this filling station and east curb of Fourth Street? A. That is correct.

"Q. You could not begin to see the west curb of Fourth Street up there, could you? A. Not without hunting for it.

"Q. You are familiar with the fact that traffic is ordinarily supposed to travzwl on its side of the street, if going south they travel on the west side, is that correct? A. That is correct.

"Q. And traffic on Fourth would of necessity travel on the west side of Fourth, west of the center line? A. Going south, that is correct."

On cross examination he also testified:

"Q. Now, Mr. Kohler, if you sit in an automobile, or you are driving an automobile and you look in your rear view mirror, can you observe the full width of a highway, as you are driving down it, to your rear? A. That is correct.

"Q. All right. Then, normally, on a three or four lane highway you can observe the whole highway, can't you? A. Generally speaking, yes. Now, of course, that means a certain distance back from the car.

"Q. Now, if when you looked in your rear view mirror, as you sat there, opposite this building here—where was your car parked when you looked back? A. Almost exactly where that little sketch is, or across from the building No. 270.

"Q. In other words, it was closer to the intersection than the building itself? A. Slightly, yes.

"Q. You could see all the way back to this point here and beyond, couldn't you? (Indicating) A. Yes.

"Q. And how far over on this side could you see? (Indicating) A. By moving your head you could see all of it.

"Q. In the rear view mirror? A. Yes, by swinging your head from side to side you could see all of it, and then some.

"Q. All right. Actually, if you were looking to the rear in your rear view mirror you could see all of the way down here, couldn't you? (Indicating) A. That is correct.

"Q. From this point here? (Indicating) A. That is correct."

Nolan Barnard, who was in the car with Green at the time of the accident testified as follows:

"Q. Did you all have occasion to stop there near Skipper's garage? A. That is right, across the street.

"Q. Then you stopped directly across the street from Skipper's garage? A. Yes, sir.

"Q. About what time of day was it? A. About 9:20—it was 9:20 or 9:30.

"Q. Where, in the car, were you sitting? A. Sitting in the back on the driver's side.

"Q. About how far back was the car parked from the west curb of Fourth Street? A. West curb of Fourth Street?

"Q. How far was it from the curb? A. Two or three inches.

"Q. About how far was the car from Laurel Street? A. Better than a hundred feet from Laurel Street.

"Q. You say it was better than a hundred feet? A. Yes, sir.

"Q. You did not measure it? A. No.

"Q. Just estimated it? A. Just estimated it.

"Q. And where were you sitting in the car? A. On the driver's side in the back.

"Q. On the driver's side in the back? Behind Thomas Green? A. Yes, sir.

"Q. Did you see a truck that struck that car door? A. Did I see him when he struck the car door, yes, sir.

"Q. Had you seen the truck before he struck the car door? A. No, sir.

"Q. Were there any cars coming from the south going north? A. No, sir.

"Q. At the time the truck struck the car door were there any other cars on your side of the street there on Fourth? A. No, sir.

"Q. Then, just the car you were in and this truck were the only vehicles there? A. Yes, sir.

"Q. Did you say you didn't see the truck before it struck the car? A. No, sir.

"Q. Did you see it after it struck the car? A. Yes, sir.

"Q. About what speed was the truck traveling after it passed the car and went on down the street? A. I would estimate he was driving about forty.

"Q. You say about what? A. About forty miles an hour.

"Q. About forty miles an hour? Did the truck stop further on down the street? A. Yes, sir. It did.

"Q. About how far down the street was it where the truck stopped? A. It was about half a block, it stopped just across the next street. It crossed the next street and stopped.

"Q. What did the truck driver do? A. Got out of his truck, came around, looked outside, went back and got in his truck and drove off.

"Q. When that truck hit the car door where was Tom Green, was he all of the way out or partly out? A. He wasn't all of the way out, he was partly out, wasn't all of the way out.

"Mr. Weller: What was that answer? A. I say he wasn't all of the way out of his car.

"Q. He was part out? A. I say the top part of his body was—

"Q. What did that lick of the truck against the car door do to the car door? A. It folded it.

"Q. Can you describe how it was folded up? A. The center part was folded inside of the car.

"Q. You mean the center part of the door was folded into the inside of the car? A. Yes, sir.

"Q. About how wide was the door after it was hit, was it a foot wide, two foot wide, or how wide? A. I could not say exactly but it was about a foot wide, I imagine."

On cross examination he testified, as follows:

"Q. You did not see this truck until the actual contact with the door with the truck, did you? Isn't that right. A. Yes, sir.

"Q. Now, did you ever look to the rear? A. No, sir. I didn't.

"Q. You didn't look to the rear? A. No, sir.

"Q. You did not see Thomas Green look to the rear either, did you? A. No, sir.

"Q. And you were sitting right there behind him, wasn't you? A. That is right.

"Q. Now, as he turned to open the door, he turned to his left, didn't he? A. That is right.

"Q. And just opened the door like that, didn't he? A. Well, I was not paying that close attention.

"Q. What? A. I was not paying that close attention.

"Q. You were not paying that close attention? But the very minute he opened the door it came in contact with the truck, didn't it? A. Well, I could not say the very minute. I was not paying that close attention.

"Q. You were not paying that much attention? Well, it was after the contact that you looked up and saw the truck? A. I seen the truck after the contact.

"Q. After the contact? A. It came in contact.

"Q. Right at the very time of the noise is when you looked up and saw it, isn't it? Isn't that right? A. (no answer audible)

"Q. Now, there wasn't any part of Green's body out of that door that you

saw, was there? A. No, sir, not as I seen it.

"Q. Huh? A. Not as I seen.

"Q. As you saw it all of his body was still inside of the car, wasn't it? A. The top part of his body, the biggest portion of it, I could not say exactly what it was—

"Q. Well, you are not telling this jury that part of his body was outside of the car, are you? A. No, sir.

"Q. Because you did not see it? A. I did not see it.

"Q. The best you could tell that at that time all of his body was in the car, wasn't it? A. The top part of his body." * *

"Q. Now, you don't know what part of the truck came in contact with what part of the car, do you? A. No, sir.

"Q. Now, you don't know whether the door hit the bed of the truck or the bed of the truck hit the door, do you? A. Well, the door was already open, it must have been the truck hit the door, the door was opened."

The appellants' counsel here questioned the witness about his answers in a deposition previously taken. On further cross examination he testified as follows:

"Q. The only time that you saw *Willis* Green make any effort toward looking to the side was the very minute he opened the door, wasn't it? A. I did not see him the exact time when he opened the door. I seen him when he had the door opened and he had his head to the side.

"Q. He had his head to the side and that is all you saw? A. That is all I seen.

"Q. At this very moment (slaps hand) this noise occurred? A. Yes, sir."

Finis Rountree testified, as follows:

"Q. On or about December 21st of last year just before Christmas for whom were you working? A. For the City of Beaumont.

"Q. And what were you doing for them? A. Well, I was a truck driver and pusher for the clean-up gang on city parks.

"Q. You say you were a pusher, also driving a truck for the Park Department, City of Beaumont? A. Yes, sir.

"Q. Did you have occasion on December 21st of 1954, last year, to be at the intersection of Laurel and Fourth Street in that truck? Where were you going at that time? A. To the City barn.

"Q. At about what time of the morning was it? A. Little after nine o'clock.

"Q. Was there anyone in the truck with you? A. No, sir.

"Q. And you were proceeding out west on Laurel? A. Yes, sir.

"Q. Did you intend to turn off Laurel at any place? A. On Fourth Street.

"Q. As you approached the— Is there a traffic control light at the intersection of Laurel and Fourth Streets? A. Yes, sir.

"Q. Is it one of these automatic signals, electric signals hanging in the middle of the street? A. Yes, sir, sure was.

"Q. What signal did you have, red or green, as you approached there? A. I had green.

"Q. As you came up to that light did you still have the green. A. Yes, sir.

"Q. Did any vehicle come south on Fourth Street as you went through that light? A. Yes, sir. It did.

"Q. And what kind of vehicle was it? A. It was a truck.

"Q. Can you describe it? What color? A. Well, it was kind of an old model truck, not too old, but loaded with sand, or something to that effect.

"Q. And at the time that truck went under that light going south on Fourth, what light did you have? A. I had green.

"Q. You still had a green light? A. Yes, sir.

"Q. And if that signal light was operating properly it reflected red on Fourth Street, is that correct? A. Yes, sir.

"Q. What did you do? Did you have to bring your truck to a stop or not? A. If I hadn't it would have been me in that wreck.

"Q. If you hadn't it would have been you in the wreck? A. Yes, sir.

"Q. About what speed was this truck going as it went under that light? A. I would judge it was going forty miles an hour.

"Q. Have you had any experience in judging speeds of vehicles? A. Yes, sir. I have.

"Q. What sort of experience have you had? A. I was an M.P. all of the time I was in service.

"Q. Did that bring you in contact with the matter of judging speeds? A. Yes, sir. I was on jeep patrol.

"Q. Sir? A. I was on jeep patrol.

"Q. You were on jeep patrol? You have driven a vehicle for about how many years, would you say? A. Since I was sixteen.

"Q. And you are how old now? A. Twenty-six.

"Q. Now, after that truck ran under that light, did you see it in contact with any vehicle down on the street? A. Yes, sir. I did.

"Q. And what part of the vehicle was it in contact with? A. The left door.

"Q. The left door. What did the truck do, did it run in a straight line, swerve, or did it make a curve out here? A. Came over to the left, then veered back to the right.

"Q. The truck after it passed the car veered to the left, then back to the right? A. Yes, sir.

"Q. And it hit the car door of that car parked there? A. Yes, sir.

"Q. Where did the truck then go? A. Just the other side of the next intersection.

"Q. Did it or not stop? A. He stopped.

"Q. What did he do? A. He just got out and walked around to the back, and I thought that he was coming back to the car, and I parked my truck in the meantime. I got out and started back to the car and when I looked around I didn't see no truck.

"Q. You mean the truck had driven off? A. Yes, sir.

"Q. Did you go back to this car, or did you just go in the vicinity of it? A. I just went in the vicinity of it. I didn't go completely up to it, but I was in twenty feet of it.

"Q. You were within twenty feet of it? A. Yes, sir.

"Q. Did you see other people around there? A. Yes, sir.

"Q. You did not go up to the car? A. Not completely.

"Q. What was the reason for that? A. Well, there was a lot of colored people came out there, and I never mixed with them too much, and I did not figure it was none of my business.

"Q. And you were going to the job. A. Yes, sir. I was taking a lawn mower to the barn to have it repaired.

"Q. Did you or not have men working under you waiting for it? A. Yes, sir.

"Q. Now, after you saw these people gathering around there you got back in your vehicle and left? A. And went on to the barn."

On cross examination he testified:

"Q. Mr. Rountree, were you stopped waiting for the light? A. No, sir.

"Q. How far down Laurel Street—Had the light changed as you approached the traffic signal? A. Well, it changed when I was quite a ways from it.

"Q. Well, how far? A. Oh, approximately a hundred feet.

"Q. Changed when it was approximately a hundred feet away? What signal was up there when you approached? A. Green.

"Q. What signal was up there when you were a hundred feet away? A. Yellow.

"Q. What? A. Yellow.

"Q. Yellow? A. Yes, sir.

"Q. Is it your testimony that as you approached that light when you were a hundred feet away the light turned from red to yellow and then from yellow to green? A. No, sir.

"Q. What is it? A. It turned to green.

"Q. When you were a hundred feet away did you observe a yellow light up there? A. No, sir, I don't believe so.

"Q. What did you observe up there? A. When I was over a hundred feet away it was red.

"Q. It was red? A. Yes, sir.

"Q. It was red from what to green, red to green? All right. And you were about a hundred feet away when you say that changed, went from red to green? A. Yes, sir. Maybe not quite that far.

"Q. Maybe not quite that far? Now, what rate of speed were you driving? A. Approximately between fifteen and twenty miles an hour.

"Q. Between fifteen and twenty miles an hour? Don't you know that when—the way the Beaumont traffic lights are set up that when you are facing a red light that before it comes on green there is a caution light facing traffic the other way, do you know what I mean? In other words,

you are facing a red light, and that light changes directly from red to green? It never does show a caution light from red to green, does it? A. I don't believe it does.

"Q. Sir? A. How was that again?

"Q. How long have you driven in the City of Beaumont? A. About four years.

"Q. About four years? All right. You drive quite a bit around traffic lights? A. Not too much. You drive backwards and forwards." * * *

"Q. All right. So while you were within a hundred feet, or less, of that intersection there was a red light up there, wasn't there, facing you? A. I had a green light facing the direction—

"Q. Well, when you got to the intersection it had turned green, hadn't it? A. It was green.

"Q. But when you were within a hundred feet of that intersection you had a red light up there, didn't you? A. It might have been, more or less.

"Q. All right. Then, more or less. A. Yes, I did not have no way of telling it.

"Q. Now, this other truck could just as well have been crossing on a caution light, couldn't it? A. Not with the length of time because when I entered the intersection the light was definitely green.

"Q. Now, you say that you saw the truck come in contact with the door of this car. Where were you at the very time you observed the contact? A. Just as I turned into the intersection, I had just got back.

"Q. Well, let's see. We have got a plat here which has been introduced in evidence. Will you come over here? This is going south on Laurel. West on Laurel. South on Fourth Street. (Indicating) A. You mean the one over there? (Indicating)

"Q. If I understand it correctly you were making a left turn from Laurel on to Fourth? Would you mark on there with

this pencil the location of your truck when you say that you saw this other car, hit the truck, and the car come in contact? A. Where was I at when I saw the actual collision?

"A. Yeah. A. I had just turned into here, just got straight about here. This is a one way street. I was there. I was nearly in the middle of the intersection when this truck went by. I had just come up, gotten straightened up here. (Indicating)

"Q. This represents your truck, as you marked it here? A. Yes, sir.

"Q. Would you put a 'T' there? A. Whereabouts do you want it?

"Q. Right up above it, beside it. That is the location of your car at that time? Go ahead. Take your seat. Now, you just tell me what you saw when your truck was at that point. A. Well, I used a few bad words, I expect, for it darn near run into me, when it swerved over to the left, it seemed he went too far to the right before he straightened up.

"Q. What did he— A. I could not see any great advantage what did it, because he was so close to the car that it knocked my vision off the side of the car with the side of his truck with the impact.

"Q. All right. Then, you didn't actually see the door of the car open, did you? A. No, sir. I didn't.

"Q. All right. And you didn't see the actual part of the truck—or what part of the truck—which came in contact with the door, did you? A. No, sir. I was in back of the truck.

"Q. You were in back of it and your view was obscured, wasn't it? A. Yes, sir.

"Q. And actually you can't tell this jury whether the truck was opposite that car or the door was opened into, or whether the door was opened first or not, can you? From what you saw? A. No, sir. I couldn't."

The appellee Thomas N. Green testified in regard to the accident, as follows:

"Q. And as you traveled south on Fourth you crossed Calder, and crossed Liberty, and Broadway, then you get to Laurel, you crossed Laurel? A. Yes, sir.

"Q. We have been talking about Laurel and Fourth Street? A. Yes, sir.

"Q. You understand Laurel Avenue runs east and west? A. Yes, sir.

"Q. And Fourth Street runs north and south? A. Yes, sir.

"Q. You traveled south on Fourth? A. Yes, sir.

"Q. At what point did you stop your car? A. I stopped it right around I estimated it about 130 feet from that Laurel.

"Q. You stopped the west side about 130 feet south of Laurel? A. Yes, sir.

"Q. In front of what place of business did you stop? A. In front of Skipper's garage, a colored fellow called Skipper.

"Q. How close to the curb did you stop? A. I was jamming the curb, right up against the curb, about two or three inches.

"Q. After you had stopped your car what did you then do? A. I stopped my car, and I looked through my rear view mirror, then I turned around like that, and—er ah—I looked around, I did not see nothing, and I opened the door and got out, had one foot on the ground, and this happened.

"Q. When you looked in the rear view mirror did you see any truck coming or any other vehicle? A. No, sir. I didn't.

"Q. When you turned and looked, and opened the door did you see any truck coming? A. No, sir. I didn't.

"Q. You say you put your left foot out? A. Yes, sir.

"Q. Was it on the ground at the time? A. Yes, sir, it was on the ground.

"Q. Then what happened? A. Well, all of a sudden something hit me from the back, I don't know what it was, whether it was a truck or what hit me, something hit me. (Slaps hands.)

"Q. What part of your car was struck by the truck? A. Sir?

"Q. What part of your car was struck by the truck? A. The door was mostly, the door.

"Q. And what did it do to the door? A. Well, uh, instead of—er ah—see, I didn't have it open too wide, had it opened about like that, truck hit it, when it hit it instrad of swinging the door around, you see, it sort of rolled it this way, all that way, rolled it around.

"Q. Just mashed it into the car? A. Yes, sir. Sort of rolled it, it carried it.

"Q. About how wide was the door after the truck hit it? A. Sir?

"Q. How wide was the door after the truck hit it? A. I don't know, sir. I could not say.

"Q. Did it injure any other part of your car? A. Well, uh, my aerial sits right there—

"Q. You mean the radio aerial? A. Yes, sir. It cut it off and bent the fender there.

"Q. What happened to you, you had one foot out, what happened to you? When this lick came? A. Well, it sort of knocked me back in against the steering wheel. I was sort of scrumbling, trying to get out.

"Q. Did what? A. I was sort of scrumbling, trying to get back into the car.

"Q. After that, what did you do? A. Well, er ah—I was there leaning up against the car, you know, the steering wheel.

"Q. Did you get out of your car? A. Sir?

"Q. Did you get out of your car? A. Not all completely. No, sir, I just got back in, when—er ah—when I looked up, well, I could see the truck stopped in the next block.

"Q. Did you see what the man did that parked the truck in the next block? A. Sir?

"Q. Did you see what the man driving that truck did, what did he do? What did he do after he went down there and parked the truck? A. Well, er ah—he got out, walked around the truck, looked around, and looked back at us, and went on.

"Q. Was there any kind of noise made by the impact of this truck against your car door? A. Yes, sir, there was a noise.

"Q. What kind of noise, was it a loud noise, or otherwise? A. Not too loud a noise that I can remember."

On cross examination he testified:

"Q. Thomas, you did not see this truck before the contact, did you? A. No, sir, I didn't see it.

"Q. You didn't see—the first time you saw this truck was after contact and when it was already out in front of your car going down the street, wasn't it? A. Yes, sir.

"Q. Now, I believe you testified on direct examination that you looked in the rear view mirror? A. I did.

"Q. When you looked, what did you see? A. I didn't see anything when I looked in the rear view mirror.

"Q. How far back down the street could you see? A. I could see plumb back to Fourth.

"Q. Plumb back to Fourth? Could you see all of the way up into that filling station there on the corner? A. Well, practically." * * *

"Q. All right. Could you see if you looked in your rear view mirror, could you see all of the way to that filling sta-

tion? A. I could see the front of the filling station.

"Q. You could see the front of the filling station? Could you see anything over here on the left of this filling station? A. I could see the outside of this next curb.

"Q. You could see that curb over there? All right. Now, did you see anything at all in the way of a truck or car all of the way back to this intersection? A. To what intersection?

"Q. To the Laurel and Fourth Street. You mean up under the light? A. Yeah. Up under the light. I could see if something was coming up under the light.

"Q. You could see if something coming under the light? A. I could see if anything coming up under the light.

"Q. You observe that in your rear view mirror? Now, when,—after you looked there, did you look any more before you opened the door? A. Yes, sir.

"Q. How did you look then? A. I turned around and looked back and I looked back towards Laurel.

".Q. After you looked back in the rear view mirror then you turned around and looked back? A. And looked back.

"Q. You could see all of the way back to Laurel Street, couldn't you? A. Yes, sir.

"Q. You could see all of the way back there to the far side of Laurel, couldn't you? A. Well, I couldn't see back to the far side, but I looked as far as Laurel Street and the light.

"Q. You looked as far as Laurel Street and the light? Was there anything to keep you from seeing? A. No, sir. There wasn't nothing.

"Q. There wasn't anything? All right. And then as you turned and opened the door did you look any more? A. Well, no, sir, I had—I had—I had just looked.

"Q. What is that? A. I had just looked in my rear view mirror and looked back and—

"Q. All right. And did you then open the door? A. Yes, sir, opened the door.

"Q. The collision occurred right at the very minute you opened the door, didn't it? A. No, sir, not that very minute, not right at the very minute.

"Q. Not right at that very minute? When did it happen? How soon after you opened the door? A. Well, I could not say about how soon, it happened, but I had time enough to open my door and put this leg on the ground before it happened. Yes, sir.

"Q. As you opened the door did you look? A. As I was opening the door.

"Q. Yeah. A. Well, I wasn't—I had already looked at the back already.

"Q. How was it that you never did see this truck until after it was out in front of you, if you looked? A. I don't know, sir. I just did not see it.

"Q. You just didn't see it. A. I did not see it.

"Q. That is the only explanation you have got, isn't it? A. When I looked back I did not see nothing, when I looked in my rear view mirror.

"Q. And then you opened the door? A. I opened the door, and tried to get my hand out—

"Q. And the truck was right there, wasn't he? A. Well, I didn't say he was right there, but I had time to get out, put this foot on the ground.

"Q. Actually, Green, you don't know whether the car door came in contact with the truck as it was passing or whether the truck came in contact with the door, do you? A. I don't—No, sir, I did not open the door on the car because I had chance to open the door and had the foot on the—

on the—because if I had opened the door I would have kept the truck from—I got this foot on the ground.

"Q. Now, you didn't see the truck before the collision so you did not make any effort to get back in the car, did you? A. I never did see the truck, so, sir, coming behind me.

"Q. You never did see the truck? A. I never did see the truck.

"Q. If you had looked you could have seen that truck, couldn't you? A. I did look, yes, sir, sure did look.

"Q. All right. How long had you been parked there before you stopped there? A. I just drove up there, I wasn't parked there long.

"Q. Did you just drive up and stop, and look in the mirror and open the door? A. I stopped, after I drove up there, I used my rear view mirror and I looked back, checking my hand, you know—

"Q. Were your windows up on your door? A. No, sir. They were not up.

"Q. Huh? A. My front window was down.

"Q. Your front window was down? A. Yes, sir.

"Q. Were any other windows in your car broken besides your front window? A. No, sir, no other windows was broken.

"Q. Now, when you crossed—I believe you said you came across Laurel Street, didn't you? A. Yes, sir.

"Q. On Fourth? A. Yes, sir.

"Q. When you came across there was that light green? A. Yes, sir.

"Q. As you were driving along did you observe any truck behind you? A. No, sir.

"Q. Did you ever see this truck? A. I never had seen it, no, sir.

"Q. Did you see the City truck up there at the intersection? A. No, sir, I did not.

"Q. (Referring to deposition) Now, when you opened that door, and put your foot out, you opened the door and put your foot out at the same time, didn't you? A. Well, er ah—No, sir, I couldn't say I done both at the same time. I opened the door and then put my foot out. Well, now, *Willis*,—you remember you gave your deposition up in my office too, didn't you? A. Yes, sir.

"Q. You have been over this testimony since you give it, haven't you? A. Been over it?

"Q. Yeah. What you testified to in my office? A. What you mean?

"Q. Well—A. Mr. Campbell just read it to me awhile ago, he wanted me to sign it.

"Q. Well, was anything wrong with what he read to you? A. No, sir.

"Q. Was there anything wrong with this now you testified to this:

"'And did you shove the door open and then put your foot out? A. Well, I was shoving it open and putting my foot out.'

"'I asked you this question: "At the same time?" You said:

"'Yes, sir, because I had looked around this way, and looked in my mirror before I stopped, and didn't see nothing.'

"Q. Now, did you look in your rear view mirror before you stopped? A. No, sir, I had stopped before I looked in my rear view mirror.

"Q. After you stopped? A. Yes, sir.

"Q. You did tell me before that you were putting your foot out and opening the door at the same time, didn't you? A. I don't remember telling you that.

"Q. Well, is it true that you did do that? A. No, sir, I opened the door then I put my foot out.

"Q. When you opened the door, did you look back then before you put the foot out or start to get out? A. No, sir. I looked in my rear view mirror and then I looked around and then I got out.

"Q. *Willis,* you never did look back after you opened the door, did you? A. No, sir, after the door was opened and I had my foot on the ground I did not look back.

"Q. All right. Now, did you open the door immediately after you had looked to the rear? A. Well, not—you know, I opened it gently like a driver would come up, driving a car, if he was in the clear and opened the door and got out.

"Q. Well, I asked you this before: (On Page 14 'You say you looked all the way back to the intersection of Laurel and Fourth? A. Yes, sir.'

"Q. That is right, isn't it? A. That is where the light is:

" 'You didn't see anything?' You answered: 'No, sir.' I asked you this question: 'And then you immediately opened the door? You answered: Yes, sir.'

"Q. Now is that true? A. That I opened it, yes, sir, yes, sir, from the driver's rear view—

"Q. All right. A. And after I looked in my rear view mirror.

"Q. And I asked you this further question:

" 'At that time, immediately you opened the door, there was contact, wasn't there? And you answered: 'Well, I had just opened the door to get my foot out?'

"Q. That is right, isn't it? A. That I had opened the door to put my foot on the ground.

"Q. And then there was contact, wasn't there? A. Yes, sir.

"Q. Now, you don't tell this jury that this truck struck you, do you? A. I couldn't say what it was struck me. I couldn't say, just like I told you in my testimony, I had my back to it, I couldn't say what struck me. All I know I was hit."

The appellee introduced in evidence the deposition of the driver of the truck, Willis King, who testified:

"Q. What time did you make this trip, Willis? A. Well, I had been down there one time; I don't know definitely the time, but I had been down there one time and come back and got another load and then come back by the place and picked up the cement and stuff and then goes on back out there.

"Q. Would you think it was about 9:30 in the morning? A. Well, I imagine so.

"Q. Do you remember driving across Laurel Street on Fourth? A. Yes, sir.

"Q. Do you remember passing a car that was parked on the west side of Fourth Street there between Laurel and the next street south? A. Well, not exactly, but— now I do remember a noise as I was going down Fourth Street * * *." * * *

"Q. Do you remember passing a car that was parked on the west side of Fourth Street there between Laurel and the next street south? A. Well, not exactly, but— now I do remember a noise as I was going on down Fourth Street; I heard a noise and I thought I had a flat on one of my tires, a blow out, and I get out and examine all six of my tires—of course, the back wheels have dual wheels; and I examined the tires; and I gets back in the truck. The truck was kind of running bad, and I decided it was a back fire; and I gets in and goes to the school and dumps my stuff and come back, and when I got back to the place a policeman was there, * * *

"Q. And where were you when the officer contacted you? A. At Mr. Lee's place.

"Q. You were at the lumber company? A. Yes, sir.

"Q. Did you remain there or go with the officers somewhere? A. I went with them back down there.

"Q. To the intersection of Fourth Street and Laurel? A. Well, it was between Laurel and South Street on Fourth.

"Q. What did you see when you got there, Willis? A. The door of his car.

"Q. What was the condition of it? A. Well, it was pretty badly bruised, sir.

"Q. As you went by that car, or that place, while going out to the school, you say you heard a noise? A. Yes, sir.

"Q. Can you describe that noise? A. Well, I tell you, lawyer, it went just like a tire blowed out, to me; it said, 'Pow'. Said it just that way. And so I gets out and examines my tires. I ain't see nothing, didn't know nothing until I got back to the place.

"Q. Sort of a small explosion? A. Yes, sir.

"Q. How far did you go before you stopped? A. I guess 25 or 30 feet, something like that.

"Q. Didn't you go past the intersection, past South Street, and stop? A. No, sir.

"Q. Did you have occasion to look back up that way? A. No, sir, I didn't.

"Q. You just examined the tires? A. Yes, sir.

"Q. And they looked all right? A. Yes, sir.

"Q. You got back in and drove off? A. Went on down to the school and delivered my stuff.

"Q. Did you examine the bed of your truck that morning after that? A. Yes, sir; after we come back to the place.

"Q. What part of it was injured or dented? A. Well, the truck wasn't dented in any way; just had some paint on the side of the bed; about middleways of the bed of the truck.

"Q. Was that paint the same color as the car? A. The car door, yes, sir.

"Q. Did you see that car there as you went by that morning the first time? A. Well, no, sir.

"Q. You don't have any recollection of seeing it? A. No, sir.

"Q. About what speed were you driving at the time you went by that place that morning when you heard this noise? A. Well, about twenty miles, I guess.

"Q. At what speed did you continue on to that colored school on the Fannett Road? A. About 35 or 40 miles an hour, kept it slowed, and it was running bad anyway."
* * *

"Q. Was the light green or red when you reached Laurel? A. It was green.

"Q. So you didn't have to stop there? A. No, sir.

"Q. You kept going south? A. Yes, sir.

"Q. And what speed did you say you were driving as you crossed Laurel? A. About twenty miles.

"Q. Did you hear anybody holler as you passed the car? A. No, sir.

"Q. You didn't see the car, so you don't know whether there was anybody there or not, do you? A. No, sir.

"Q. You said something about the truck not operating right. What seemed to be wrong with it? A. I don't know, sir; it was running bad someway or another, been running bad for four or five days.

"Q. What was the cause of it? Do you have any idea? A. Well, you know, it didn't pull good.

"Q. Didn't seem to have power? A. That's right." * * *

"Q. Now, as you came down Fourth Street and after you crossed Laurel, there was no car coming south, going north, meeting you? A. No, sir.

"Q. Were the only cars there at that time the cars parked on the west side of Fourth? A. Yes, sir.

"Q. And your truck going south? A. Yes, sir."

The appellants offered the following from King's deposition:

"Q. Willis, was your windshield clear that day? A. Yes, sir.

"Q. Were you able to see traffic that was moving ahead of you? A. Yes, sir.

"Q. Were you keeping a lookout for traffic ahead of you? A. Yes, sir.

"Q. Mr. Adams asked you if you saw this particular automobile in which Green says he was stopped. Did you pay any particular attention to a stopped car? A. It was three of four cars along there.

"Q. There were three or four cars along there? A. Yes, sir, all down that line.

"Q. And he asked you if you saw this particular car before it happened? A. Oh, no, sir.

"Q. Did you mean that there wasn't any activity to direct your attention to the car— A. No, sir.

"Q. Did you mean that you weren't in a position to see the car? A. Oh, yes, sir, I was in a position to see it.

"Q. If there had been any car there, could you have seen it? A. I would have seen it.

"Q. Were you looking ahead as you were driving ahead? A. Yes, sir.

"Q. So you had no occasion to pay any particular attention to a parked car, did you. A. No, sir.

"Q. You described this truck bed. Did that door hit any part of the front part of the truck? A. No, sir.

"Q. Did it hit any part of the cab? A. No, sir.

"Q. And the only mark that you saw on the truck— A. Was on the bed.

"Q. On the bed? A. Yes, sir; about middleways.

"Q. Who examined that truck with you? A. Mr. Doug Williams and Mr. Wallace.

"Q. Mr. Wallace is the officer? A. Yes, sir."

In behalf of appellants, Willis King testified, as follows:

"Q. All right. When you got to Laurel, did you have a stop there? A. Green light there.

"Q. You heard this man testify that you ran a red light there, did you do that? A. No, sir. I did not run no red light.

"Q. Do you make a practice of running through red lights. A. Never have.

"Q. At what rate of speed were you driving your truck, at or about the time that you passed Laurel Street there? A. Oh, around twenty or twenty-five miles an hour.

"Q. Now, as you—after you passed Laurel—Let me ask you this: What was the condition of the windshield of your car? A. What was the condition if it?

"Q. Yes, of the truck? A. It was good.

"Q. Was it clean? A. Yes, sir.

"Q. What was the weather that morning? A. Oh, it was a little damp.

"Q. It was what? A. Little damp.

"Q. Little damp? A. Yes, sir.

"Q. Was it raining at the time or not? A. No, sir. It wasn't raining.

"Q. Now, as you were driving, after you crossed Laurel there at Fourth, were you looking out ahead of you? A. Yes, sir.

"Q. Were you watching where you were going? A. Yes, sir.

"Q. As you went along between Laurel and South on Fourth, did anything happen that morning? A. Yes, sir.

"Q. Just tell the jury what you heard, what you saw, and what you did, after you crossed Laurel and at the time you stopped. A. Well, I heard a noise after I got to—after I crossed Laurel between Laurel and Fourth Street—South Street, and the truck was running bad, and so I drove on down, I guess about twenty-five or thirty feet, and I stopped and gets out, examined my tires. I thought I had a blow out, all six of my tires, front and back. My tires wasn't bad. I thought then that the truck had backfired. I got back in, went on and carried my sand.

"Q. Now, Willis, after this noise occurred did you stop your truck? A. Yes, sir. I stopped it.

"Q. Now, where did you stop the truck? A. I stopped the truck about half way down the block there.

"Q. In other words, you went across the —? A. Yes, sir.

"Q.—following street—A. That's right.

"Q.—stopped on the other side? A. That's right.

"Q. You got out and examined your tires? A. Yes, sir.

"Q. Did anybody yell at you? A. I didn't hear anybody.

"Q. You didn't hear anybody? A. No, sir.

"Q. At that time did you know that your truck had come in contact with the door of a car? A. No, sir. I didn't.

"Q. If you had known it, would you have left the scene? A. No, sir. I would have went to it, like I did, get out to see what happened anyway.

"Q. All right. Did you have any intention of hitting and running that morning? A. No, sir. Not a bit in the world.

"Q. Now, were there any cars parked along there on the right on Fourth Street? A. Yes, sir.

"Q. After you passed Laurel? A. Yes, sir.

"Q. Did you pay any particular attention to them as you were driving along? A. No, sir.

"Q. Did you see anyone opening a door? A. No, sir.

"Q. As you were passing? A. No, sir.

"Q. Now, after you stopped, did you know that your truck had come in contact with the door of a car? A. No, sir. I didn't.

"Q. When did you first learn that? A. I did not know it until I got back up to the place and the policeman was up there.

"Q. Then they asked you about it? A. Yes, sir.

"Q. Did you tell them about the noise? A. Yeah. I told them about the noise."
* * *

"Q. Willis, did you examine the body of the truck? A. Yes, sir.

"Q. At that time? A. Yes, sir.

"Q. Was Mr. Doug Williams there? A. Yes, sir. He was.

"Q. Was the police officer, Officer Wallace, there? A. Yes, sir.

"Q. What did you see, if anything, on the body or the bed of the truck? A. Well, I saw some green looking paint on about half way the bed of the truck.

"Q. And what color was this Dodge car? A. Blue looking, I believe.

"Q. What did you say? A. Blue looking.

"Q. Blue looking. Was that the only mark on the truck that you could find? A. Onliest mark.

"Q. And where did you say that was located? A. That was on the bed of the truck, about—

"Q. On the bed of the truck? A. Yes, sir.

"Q. Were there any marks on the front fender? A. No, sir.

"Q. Any marks on the front of the bed? A. No, sir.

"Q. I show you here a photograph, is that a photograph of the truck? (Hands to witness) That you were driving that day? A. That is it.

"Q. That is the truck you were driving? A. That is it.

"Q. Now, I would like to identify that one, please, sir, also this car. Now, Willis will you mark on there about where you saw the paint on the body there about where you saw the paint? Here is a pencil. Put an 'X' there about where. (Witness marks) All right. You put an 'X' mark in ink on here about where you saw the paint? (Indicating) A. Yes, sir.

"Q. On the bed of the truck? A. Yes, sir." * * *

"Q. Willis, after you passed the intersection of Fourth and Laurel Street, what rate of speed were you driving this truck? A. After I passed—how was that lawyer?

"Q. After you passed the traffic light up there at Fourth and Laurel Streets, what rate of speed were you making? A. After this accident?

"Q. No, before the accident? A. About twenty or twenty-five miles an hour.

"Q. About twenty or twenty-five miles an hour? I believe that is all."

On cross examination he testified:

"Q. You say the truck was not running well? A. No, sir.

"Q. I suppose it was missing in the motor, or was it the wheels, or what? A. Yes, sir.

"Q. What model truck was that, Willis? A. '46, I believe.

"Q. 1946 model, what, a Ford? A. Ford.

"Q. I suppose it had always been used to haul sand, and cement, gravel, such as that? A. Since I have been employed by the company, it has.

"Q. Now, you say that as you went down Laurel Street after you passed the light at Laurel and Fourth, as you passed that light you heard a noise? A. Yes, sir.

"Q. Kind of like a sort of little explosion, is that it? A. Yes, sir.

"Q. I believe you have described that noise as sounding like an explosion, is that correct? A. Yes, sir.

"Q. I thought I understood you to say a few minutes ago when questioned by Mr. Weller that you went twenty-five or thirty feet and stopped, is that right? A. That's right.

"Q. And, I believe, under questioning by Mr. Weller, you testified that you stopped south of the next street, which is also south of Laurel, is that right? A. Yes, sir.

"Q. Now, we are not mistaken about what you have said? Let's say it again. You say that you stopped south of the street, which is one block south of Laurel, is that right? A. Yes, sir.

"Q. Why are you saying that here today? A. I don't understand you, lawyer, Adams.

"Q. Sir? A. Explain yourself. I don't understand you.

"Q. Pardon me. I say why are you saying that here today that you stopped south of the street, which is one block south of Laurel?" * * *

"Q. I asked you this: Why did you say here today you stopped south of that street, which is one block south of Laurel? A. I stopped there when I had that accident.

"Q. All right. Now, that is where you stopped, you understood me on that, didn't you? A. Yes, sir.

"Q. Now, when we took your testimony on the 11th day of February, 1955, that was about—less than a month after this thing occurred, wasn't it? A. I disremember when it was taken.

"Q. When the truck was in collision with the car that was December 21, 1954? A. Yes, sir.

"Q. All right. On February 11, 1955 you testified up in Mr. Weller's office, didn't you? A. Yes, sir.

"Q. And on page 4 of your testimony you were asked these questions: 'How far did you go before you stopped? And your answer was: I guess 25 or 30 feet, something like that.'

"Q. Didn't you go past the intersection, past South Street? And you said: 'No, sir.' Didn't you testify to that at the time we took your deposition? A. I passed South Street.

"Q. What is that? A. I don't remember that." * * *

"Q. So, when you passed Tom Green's truck there was nothing—(I mean car) there was nothing to keep you from seeing it because these cars parked along there were parked down further, weren't they? A. That is right.

"Q. That is right. Now, you have driven a truck for a long period of time, some twenty years, I believe you said? A. Yes, sir.

"Q. And you know that when a vehicle is missing and having trouble, while running, in order to get it to move anything like smoothly, you try to step up your speed on it, don't you? A. Yes, sir, sometimes.

"Q. You sort of have to run it fast to keep it going? A. Sometimes you do, and sometimes you don't.

"Q. Now, if a car is missing and you run it slow, it will jump like that, will it not? Is that correct? A. It wasn't that bad.

"Q. It was just bad enough if you run it 25 or 30 miles an hour it would run all right, is that right? A. No, sir, it was not running all right at that time.

"Q. Well, in your opinion, at what speed was it missing? You say the motor was giving you trouble, at what speed was it missing? A. It was missing all of the way through, any speed it would miss.

"Q. How many cylinders did this motor have? A. Six.

"Q. And you say it had been missing four or five days? A. Yes, sir.

"Q. Had you reported that to Roy Lee Lumber Company? A. Yes, sir." * * *

"Q. Now, as you came through that light there at Laurel, you recognize that this is sort of an 'S' curve coming down there south on Fourth, don't you? A. Yes, sir.

"Q. Do you know that the west curb of Fourth is 10½ feet east of the east curb of Fourth up here north of Laurel? A. No, sir. I did not know that.

"Q. You did not know that? A. No, sir.

"Q. And do you know that the west curb of Fourth north of Laurel, if projected straight south, it would come 40.5 feet west of the west curb of Fourth Street, come away over here, did you know that? A. No, sir.

"Q. At any rate, you do know when you came down this street you had to cut away out like that, don't you? A. Yes, sir.

"Q. And coming through there at a speed of 25 or 30 miles an hour with 8,000 pounds of sand and 1,880 pounds of cement with a truck weighing 4,715 pounds she

was sort of swaying through that intersection, wasn't she, and you swayed out right here, didn't you, Willis? You remember that, don't you? A. There is a little curve around that light there all right enough.

"Q. What did you say? A. I had to make a little curve coming around that light all right enough.

"Q. You had to make a little curve? A. Yes, sir.

"Q. And the truck sort of swayed just a little bit, didn't it? A. No, sir.

"Q. It did not sway any? A. No, sir, not that I know of.

"Q. Now, you testified by deposition, I suppose you will stand by, that you did not see this car here. As a matter of fact, when you were coming down making 25 or 30 miles an hour, by your testimony, or forty under the testimony of others, you were so busy trying to make this curve you were too busy to try to control the old missing truck that you did not have time to see what was on the road, you were pretty busy at that time, isn't that right, Willis? A. No, sir. I wasn't, lawyer Adams, sure wasn't. You know, I seen them—I did not see that exact particular car.

"Q. Well, now, you have said that other cars were away down here between South and Pecos and General Lumber Company and you say that there were no cars meeting you, so then your vehicle and this car of Green's were the only ones in that whole block, how do you account for not seeing it? Just pretty busy, weren't you? A. No, sir, I wasn't.

"Q. You don't think you were? A. Sure wasn't."

The appellants introduced a portion of the deposition of Thomas Green, which was as follows:

"Q. Now, let me ask you this: As you started to open the door, did you open it with your left hand, or how? A. With my left hand, yes, sir.

"Q. With your left hand? A. Yes, sir.

"Q. And did you shove the door open and then put your foot out? A. Well, I was shoving it open and putting my foot out.

"Q. At the same time? A. Yes, sir, because I had looked around this way, and looked in my mirror before I stopped, and didn't see nothing.

"Q. You volunteered the information you looked in the mirror? A. And looked around, both, and didn't see nothing approaching.

"Q. And you say you looked around. Did you do that before you opened the door or at the time you were opening the door? A. I looked at my mirror before I opened the door, and I looked around before I opened the door.

"Q. Before you opened the door. A. Before I opened the door.

"Q. And you didn't see anything? A. No, sir.

"Q. Did you then immediately open the door? A. Yes, sir, I opened the door in about a minute.

"Q. In other words, you waited awhile before you opened the door, didn't you? A. Not too long, no, sir. After I looked in my mirror and looked around, well, then, I just turned my attention and went and opened the door.

"Q. When you say you looked around, could you see all the way back to the light at Fourth Street? A. Yes, sir.

"Q. It was clear all the way back to Fourth Street? A. Yes, sir.

"Q. You could see even beyond Fourth Street, couldn't you? A. I didn't say Fourth Street. It was Laurel.

"Q. You could see beyond Laurel on Fourth, couldn't you? A. Yes, if I had looked; but all I was looking for was enough clearance for me.

"Q. You say you looked all the way back to the intersection of Laurel and Fourth? A. Yes, sir.

"Q. You didn't see anything? A. No, sir.

"Q. And then you immediately opened the door? A. Yes, sir.

"Q. At that time, immediately you opened the door, there was contact, wasn't there? A. Well, I had just opened the door, to get my feet out.

"Q. Which foot did you have out of the car? A. This one right here. (Indicating)

"Q. You had your left foot out of the car? A. Yes, sir.

"Q. And the first time you saw the truck, it was down in front of your car? A. After it had hit me, yes, sir.

"Q. After it had come in contact with the door? A. After it had done hit me."

The appellants argue that the above testimony is not evidence of any improper driving on the part of Willis King or of failure of King to have proper control of his truck, or any evidence that King failed to keep a proper lookout or that a failure to have proper control or to keep a proper lookout was a proximate cause of the accident. The appellants assert that this evidence shows that the impact occurred at the very moment the door was opened and that the door of the car came in contact with the bed of the truck at about one-third the length of the bed behind the cab. They assume that the truck was proceeding in a straight line parallel to the parked car at the time of the collision, and they say that the physical facts and the construction of the truck make it physically impossible for the truck to have been traveling in a direction other than parallel at or immediately prior to the impact. They argue that since Azar did not see the truck before the impact, Barnard did not see the truck until after the door was in contact with the truck and Rountree saw only the truck moving in front of him

and could not tell whether the door of the parked car was open at the time the truck passed or was opened as the truck was passing; that Green did not see the truck until after contact with the door and truck bed; that King testified that he did not recall seeing the car as he passed it on Fourth Street. We cannot agree that from all of the evidence which we have quoted above the jury was not warranted in finding failure to keep a proper lookout, failure to have the heavily loaded truck under proper control and that these failures and omissions were a proximate cause of the collision. As we view this evidence, the jury was warranted in believing therefrom that Green looked to the rear of his car as he started to get out on the left-hand side, saw no vehicle approaching which threatened him with injury and had his car open and one foot on the ground at the time the truck or a part thereof hit his car door. From Rountree's testimony the truck driven by King came through the traffic light at the intersection of Fourth Street and Laurel Avenue while the red light was showing against it, made the jog to the left as he continued on South on Fourth Street, and pulled back to his right and struck the door of Green's parked car or some part of it, which was about 100 feet from the intersection. It is entirely possible from this evidence, and the jury was warranted in believing, that when Green looked back from his car toward Laurel Avenue the truck was still on the far side of Laurel and traveling at a speed of 40 miles per hour, and that it arrived at the point where the parked car was after Green had looked back and at about the same time but shortly before the car door was opened. The fact that King did not see the car or see the car door open as he passed would not prove that the door was not open, but on the contrary, since he testified that he was looking ahead and was not paying any particular attention to cars parked on the west side of Fourth Street, that he was not keeping a proper lookout for objects and cars at that point. The testimony of the witness Rountree appears to us to be strongly in support

of the jury's finding that King did not have his heavily loaded truck under control as he went through the intersection of Fourth Street and Laurel Avenue, and made the jog or curve. All of this testimony presents facts from which the jury was warranted in making its deduction that such failures and omissions on the part of King were proximate causes of the collision; that King under these circumstances should have anticipated that such a collision or one of similar nature as the one detailed here would likely occur as a result of such a manner of driving the truck. We also cannot agree with the contention of the appellants that such acts could not be the proximate cause of this collision, because the evidence shows, as they contend, that Green opened his car door into the side of the truck and that such act was the proximate cause of the collision as a matter of law. Green testified to the contrary. We shall discuss this matter of Green's negligence vel non under other points below. We do not believe that the fact that King testified that the only mark on the truck bed was found approximately one-third of the distance from the front of the bed to the rear, and that others also so testified, makes it conclusive proof as a matter of law that it was the only point of contact between the car and the truck, or that this conclusively establishes that the car door was opened into the side of the truck after the truck front fender had passed the car door. The truck, from the evidence, might have been traveling in a direction not parallel to the line of the side of the car but at angles toward the car and away from it immediately before they collided. Several pictures of the truck were in evidence before the jury, which they could consider for what they were worth.

We overrule appellants' Points Nos. 1 to 29, inclusive, believing that the evidence presented sufficient facts to support the jury's findings as we have indicated.

By their Points of Error Nos. 30, 31 and 32, the appellants complain of the court's manner of submitting Special Issue No. 4, which read as follows: "Do you find from a preponderance of the evidence that at and immediately prior to the time the truck came in contact with the door of Thomas Green's automobile, the said Willis King failed to maintain a proper lookout?" The objection made by the appellants in their amended motion for new trial was that such issue, as submitted, was a comment on the weight of the evidence, in that it assumes that defendants' truck struck plaintiff's door, or if it does not assume such as a fact, the implication, phrasing or commentation implies that defendants' truck struck the door of plaintiff's car, whereas the fact is that plaintiff opened the door of his car into the truck. Point 30 is that the court erred in failing to disregard the answer of the jury to such special issue for the reason given that the issue is a comment on the weight of the evidence, Point 31 complains of the court's action in overruling the above objection to the special issue, and Point 32 complains of the court's action in failing to disregard the answer of the jury to Special Issue No. 5 to the effect that the failure of King to keep a proper lookout was a proximate cause, because such issue is a comment on the weight of the evidence in that such issue assumes and instructs the jury that the truck came in contact with the door of plaintiff's automobile, whereas the undisputed evidence shows that plaintiff opened his door into the truck, the door striking the bed of the truck at a point at approximately one-third of the way back from the front end of the truck bed. These points are overruled. We do not believe the language of the two issues complained of is subject to the criticism of the appellants that they assume that the truck ran into the door of Green's car. It seems to us that use of the phrase "came in contact with the door of Green's automobile" evidences a meticulous avoidance by the trial court of any phraseology which might indicate any assumption of fact, either that the truck struck the car or that the car struck the truck. In the first place, we cannot see where anyone could find a dispute in the evidence over the fact

that the truck and the car door did come in contact on this occasion. The inquiry by the court in these two issues was directed to the question of failure vel non of King to keep a proper lookout, and the phrase complained of was fixed at the time inquired about, that is, immediately prior to the time the truck came in contact with the door of Green's car. It gives no indication of how the court felt about the question of whether Green opened the door of his car into the truck, or the door had been opened when the truck came in contact with it.

■ Under Points 40, 41 and 72, appellants complain in regard to Special Issues Nos. 6 and 7 in the court's charge. These issues read as follows:

"Special Issue No. 6.

"Do you find from a preponderance of the evidence that on the occasion in question Willis King operated his truck more closely to the automobile of Thomas Green than a person of ordinary prudence in the exercise of ordinary care would have operated same?

"Special Issue No. 7

"Do you find from a preponderance of the evidence that such operation (if you have so found) was a proximate cause of the collision in question?"

Appellants made the objection to Special Issue No. 6 that it was a comment on the weight of the evidence, that it was duplicitous, that it submits in one issue two facts, (a) whether King operated his truck more closely and (b) whether such act of operating it more closely was negligence, and that the defendants were entitled to have said issues submitted separately. They say that the issue assumes that King operated his truck closer to Green's car, or that he operated it more closely than it should have been, and leaves the jury only to determine whether such was negligence. The appellants say that this was not an ultimate issue and does not submit the violation of any duty or care. From the evidence, which is quoted above in this opinion, it appears

without dispute that the truck was being operated close enough to Green's car to hit the door when it was open. The ultimate inquiry here was then not whether the truck was operated close to the car but simply whether King operated his truck more closely to the car than a person of ordinary prudence in the exercise of ordinary care would have operated it. These points are overruled on the authority of Cornett v. Hardy, Tex.Civ.App., 241 S.W.2d 186; Meyer v. Great American Indemnity Co., 154 Tex. 408, 279 S.W.2d 575.

Points Nos. 36, 37, 71, 73, 82 and 77 all complain of said Special Issue No. 5, whether the appellant King operated his truck more closely to Green's car than a person of ordinary care would have done. Appellants say that there was no predicate for finding such an act was negligence and because of the manner in which the issue was submitted it was a "global submission". They say there is no definition of the phrase "more closely" and no guide for the jury to have in considering such terminology. They also say that the court should have submitted the question of whether such act, as found by the jury, was negligence. We think the evidence raises the question of whether King was operating his truck too closely for safety to Green's car and whether he should have reasonably foreseen that such an injury or one of a similar general nature would have resulted from such an act. We also think it is apparent that the language of the issue made it unnecessary to submit another issue in connection therewith as to whether such action was negligence. See: Little Rock Furniture Mfg. Co. v. Dunn, 148 Tex. 197, 222 S.W.2d 985 and S. H. Kress & Co. v. Selph, Tex.Civ.App., 250 S.W.2d 883. These points present no error and they are overruled.

■ Appellants' Points 53 and 54 complain of the court's submission in Special Issue No. 18 of the charge in regard to the question of damages to Green's automobile. Said special issue inquired of the jury

what was a reasonable amount for repairs made necessary to Green's car as a result of the collision. Appellants objected to said issue on the ground that this was an improper measure of damages, the proper measure being the difference between the reasonable cash market value before and the reasonable cash market value of said car after the collision. They made a further objection that there was no evidence of the market value of the car before and after the collision. The appellee's petition alleged that his automobile was of a reasonable value of $200 less after the collision than it was before. He put on no proof of difference in reasonable value. The only evidence offered in that regard was an estimator for an automobile agency in Beaumont, who estimated the cost of repairs to the car at $282.10. The appellants made no objection to any of the testimony in behalf of the appellee. The jury found that the reasonable amount for the repairs was $165.00. Appellants made no effort to controvert any of the evidence as to cost of repairs and there was other evidence that the car was shaken up considerably and that the windshield post was bent. In Mc-Mahan v. Musgrave, Tex.Civ.App., 229 S. W.2d 894 the court had a similar question before it. The plaintiff had pleaded a diminished market value as a measure of damage, but on the trial, offered evidence as to the reasonable cost of repairs. The court held in that case that the allegations with reference to damages do not necessarily restrict one to proof of the difference between the value of the automobile before and after the accident; that it is not necessary that plaintiff allege the measure of damages. In the instant case, from the testimony that repairs would cost $282.10 and the jury's finding that the reasonable cost was $165, we do not think the court was unwarranted in including in its judgment the sum of $165 for damages to Green's car. This item of damage included in the judgment represents such a small portion of the entire judgment that its inclusion would not warrant a reversal of the judgment. These points present no reversible error and they are overruled.

Under Points 47, 48, 49, 50 and 51 the appellants contend that the undisputed evidence shows that Green was guilty of contributory negligence in opening his car door on the left side and attempting to get out into Fourth Street. They contend that the court should have sustained their motion to disregard the finding of the jury to Special Issue No. 8, that Green did not fail to keep a proper lookout before attempting to open his door. We are unable to agree with this contention as was pointed out above in our discussion of appellants' first group of points. We believe there was evidence before the jury that Green did look back before he began to get out of his car and before he opened the door of his car. Under all the circumstances as related above, including the jog in Fourth Street where it crosses Laurel Avenue, the speed of the truck and Green's own testimony, we think the jury's finding in this regard is amply supported by the evidence.

Appellants' Points Nos. 55, 56, 57 and 58 contain another attack on the evidence and issues in regard to whether King had his truck under proper control. They say such issue did not submit properly the question of negligence in that regard. We think this group of issues is a restatement of contentions already made by the appellants in prior portions of their brief. We have discussed them above sufficiently, and they are overruled without further discussion. We will say in passing that the issue complained of contained a definition of proper control, in which ordinary care was defined as such care as an ordinary prudent person would use, and that proper control was defined as such control as would be kept by a person of ordinary prudence in the exercise of ordinary care. In Little Rock Furniture Mfg. Co., v. Dunn case, supra, this was a proper submission of this issue.

Under Points Nos. 59, 60, 61, 62, 63, 64 and 65 the appellants complain of the court's

failure to submit their requested Issues Nos. 1, 2, 5, 6, 7, 8 and 9. Said issues read as follows:

"Special Issue No. 1

"Do you find from a preponderance of the evidence that Thomas N. Green was negligent in failing to discover the defendants' truck before opening the door of his car?

"Special Issue No. 2

"If you have answered the foregoing Special Issue No. 1 'Yes', then answer the following:

"Do you find from a preponderance of the evidence that such failure of Thomas N. Green to discover the defendants' truck prior to opening the door of his car was a proximate cause of any injury and damage sustained by plaintiff?

"Special Issue No. 5

"Do you find from a preponderance of the evidence that Thomas N. Green was negligent in failing to get out of his car on the right hand side next to the curb?

"Special Issue No. 6

"Do you find from a preponderance of the evidence that the act of Thomas Green in failing to get out of his car on the right side next to the curb was a proximate cause of the occurrence in question on December 21, 1954?

"Special Issue No. 7

"Do you find from a preponderance of the evidence that Thomas N. Green failed to ascertain that he could dismount from his car on the left hand side in safety before opening the door and starting to get out?

"Special Issue No. 8

"If you have answered the foregoing special issue 'Yes', then answer the following:

"Do you find from a preponderance of the evidence that the failure of Thomas N. Green to ascertain that he could dismount from his car on the left hand side in safety before opening the door and starting to get out, if you have so found, was negligence?

"Special Issue No. 9

"If you have answered the foregoing special issue 'Yes', then answer the following:

"Do you find from a preponderance of the evidence that such failure of Thomas N. Green to ascertain that he could dismount from his car on the left side in safety before opening the door, if you have so found, was a proximate cause of the occurrence on December 21, 1954?"

We believe that all of these matters which the appellants sought to have submitted to the jury were submitted in the issues contained in the court's charge. They were evidentiary issues and sought to go in detail into the question of Green's action in opening the car door and attempting to get out of his car. These points present no error and they are overruled.

■ Points Nos. 83 and 84 complain of a portion of the instruction accompanying Special Issue No. 19 of the court's charge, which was the issue involving damages for physical injuries to Green's body. They say the last paragraph in said instruction is a comment on the weight of the evidence in that it assumes that pre-existing conditions will be aggravated, and they further say that Special Issue No. 19 does not properly place the burden of proof and does not instruct the jury that in considering aggravation of any pre-existing condition, if any, the jury may consider it only to the extent that they may find from a preponderance of the evidence that pre-existing injury, disease or condition, if any, has been aggravated. The instruction complained of reads in part as follows:

" * * * but in this connection, you are instructed that in estimating the damages you may take into consideration any pain and suffering in the past, or that Thomas Green may in reasonable probability suffer

in the future, as well as any loss of earnings in the past or that he may in reasonable probability sustain in the future proximately caused him by aggravating pre-existing conditions and physical infirmities, if any, of Thomas Green, by the negligence, if any, of the defendants on the occasion in question, as shown by a preponderance of the evidence."

We do not believe this instruction is subject to this criticism. The issue begins with the phrase "From a preponderance of the evidence." There is no comment on the weight of the evidence as we see it, because the words "if any" are placed in two necessary positions in the course of the instruction in such a way as to relieve the charge of the vice attributed to it by the appellants. On the authority of Texas Employers Ins. Ass'n v. McKay, 146 Tex. 569, 210 S.W.2d 147 these points are overruled.

Appellants' Points Nos. 85 and 86 complain of a portion of the argument of counsel for appellee to the jury. Counsel in his closing argument stated, "Let's see some of the other things he has observed about. He said Tom Green would not give them a medical examination. Tom Green that very day at the very scene of the car asked them 'Will you send me to a doctor'? They said 'No.'" Objection was made that the argument was outside the record. The trial court sustained the objection and instructed the jury not to consider it for any purpose. These points present no reversible error. Counsel was obviously replying to an argument of appellants' counsel to the effect that Green refused to allow a medical examination by a doctor for the appellants. The trial court promptly instructed the jury to disregard the argument, which action we think cured any error which might have been present in the argument. Under these circumstances, we are unable to see how this incident could have improperly influenced the verdict of the jury or the judgment of the court.

We think the case was properly tried; that the contentions of both parties have been adequately and rather fully presented, both on trial and in their briefs on appeal, and that the record presents nothing requiring a reversal of the judgment.

The judgment of the trial court is affirmed.